UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 24-cr-10227-DJC |
| ISAIAH AARON TENRYK | |
| Defendant | |

<u>SENTENCING MEMORANDUM</u>

The United States respectfully submits this memorandum in connection with the sentencing of the defendant, Isaiah Aaron Tenryk, which is scheduled for December 12, 2024.

The defendant has pleaded guilty to conspiracy to commit bank fraud conspiracy, bank fraud, and aggravated identity theft, in violation of 18 U.S.C. §§ 1349, 1344, and 1028A(a)(1), respectively, arising from a scheme to steal a $3 million tax credit intended for a non-profit business that provides care and support to children with disabilities.

Consistent with the plea agreement between the parties, the government asks the Court to impose a sentence of 57 months of incarceration, 36 months of supervised release, and a mandatory special assessment of $300.  The Court should also order $10,730.63 in restitution to the U.S. Treasury.

BACKGROUND AND OFFENSE CONDUCT

The defendant lived in Brooklyn, New York, where he owned and operated a media company and worked on and off as a security guard and delivery driver.  (PSR ¶¶ 14, 69-73.)

No later than about January 2023, the defendant got involved in fraud schemes in which he used stolen identities to cash or to deposit stolen checks.  (PSR ¶ 27.)  The defendant's role was to be the face of the fraud on fake identity documents used to deceive financial institutions.  (*Id*.)

In mid-March 2024, a mutual friend introduced the defendant to a person known as "Big Bank." (PSR ¶ 14.) The defendant agreed to help Big Bank commit fraud by opening bank accounts using stolen identities and depositing stolen checks. (PSR ¶ 15.) In late March 2024, the defendant deposited a stolen check for $10,000 payable to a South Carolina man, whose identity the defendant assumed to open a fraudulent bank account. (PSR ¶¶ 15-16.)

Thereafter, the defendant tried to find more stolen checks for the scheme with Big Bank. On March 31, 2024, he sent Big Bank images of 15 stolen U.S. Treasury checks that were for sale and explained that the seller wanted 15 to 20 percent. (PSR ¶ 18.) The checks were payable to individuals and ranged in value from about $5,000 to about $15,000. On April 18, 2024, the defendant sent Big Bank another image of 14 stolen U.S. Treasury checks for sale. (PSR ¶ 19.) These were also payable to individuals and ranged in value from about $12,000 to about $33,000.

On April 19, 2024, Big Bank sent the defendant information about the Company and personal identifiers for its CEO. (PSR ¶ 20.)

The Company was a charitable business with operations in the mid-Atlantic that provided support and care to children and adults with disabilities. (PSR ¶ 10.) The Company had applied for and been awarded an Employee Retention Tax Credit, which is a form of COVID-19 pandemic relief to help businesses that kept individuals employed during the pandemic. (PSR ¶ 11.)

On April 19, 2024, Big Bank and the defendant travelled from New York to Boston and tried, unsuccessfully, to open a bank account for the Company. (PSR ¶ 22.) On April 24, 2024, they returned to Boston and succeeded in opening an account in the Company's and the CEO's name. The bank required the defendant to return the following day with another corporate officer to verify information for the Company. The defendant did so with an unidentified co-conspirator,

and after completing the account opening, he deposited a $3,078,000 tax credit check payable to the Company and the CEO.  (PSR ¶ 22.)

In the following days, there were numerous attempts to get money out of the fraudulent account, but the co-conspirators were unsuccessful.  (PSR ¶ 23.)

On May 10, 2024, the defendant, pretending again to be the CEO, returned to the bank to arrange for wires in person.  He was arrested at that time.  (PSR ¶ 24.)

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████   ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

## THE APPLICABLE GUIDELINES

In the plea agreement, the parties calculated the defendant's offense level under the Guidelines to be 20.  United States Probation reached the same conclusion.  (PSR ¶¶ 32-45.)  The government relies on and adopts the Guideline in the PSR.

## SENTENCING ARGUMENT

The government recommends a sentence of incarceration of 57 months.  This comprises a 24-month mandatory minimum sentence for the aggravated identity theft and a 33 month sentence for the bank fraud, with an intended loss of just under $3.1 million.

### *Background and Characteristics of the Defendant*

The defendant comes from a broken home and grew up in rough circumstances in New York.  His home life as a child was characterized by familial strife, and he witnessed violence at home.  (PSR ¶¶ 54-56.)  Nevertheless, the defendant obtained a college education and two

3

professional licenses.  (PSR ¶ 68.)  From 2022 to present, the defendant has owned and operated a media company that edits music videos and other audiovisual materials.  (PSR ¶ 69.)  The defendant has worked as a security guard and a driver.  (PSR ¶¶ 70-73.)  According to information submitted by the defendant, which is consistent with the undersigned counsel's interactions with the defendant, he is thoughtful, insightful, intelligent, and genial.  *See* Exhibit to Def.'selo Sent. Mem.

### The Seriousness of the Offense

The defendant stole the identity of the CEO of a charity that helps disabled children so that he could steal a $3 million tax credit to the charity.  He was unsuccessful, but fraud still harmed the charity.  Absent the needed funds, the charity had to curtail its operations, place programs on hold, and pay lower wages and incentives to employees—all of whom were involved in providing care to a very vulnerable population.

To accomplish his goal, the defendant stole and used the CEO's identity.

And the defendant knew and understood exactly what he was doing.  As noted in the PSR, the defendant used a stolen identity as early as January 2023, and in his conspiracy with Big Bank, he used the stolen identity of another person to steal about $10,000.

Moreover, the defendant intended, or at least wanted, to commit more fraud and identity theft.  Before coming to Boston, the defendant tried to find new fraud targets and sent images of stolen checks to Big Bank.  Each of those stolen checks was payable to a different person.  Each would have required an additional identity theft.  Many of those U.S. Treasury checks were for amounts between $5,000 and $15,000.  It is fair to assume that many of the checks were to persons of moderate means for whom such a tax refund or credit would have made a significant difference.  The fact that the money being stolen, like the check payable to the Company, would have come

from the U.S. Treasury and not from the payee is no mitigation at all. The checks were intended for real individuals to have money in their pockets, just as the check to the Company was intended for the Company to have money in its accounts to pay expenses and wages and carry out its charitable mission.

*Just Punishment, Promoting Respect for the Law, and General Deterrence*

This defendant will likely be specifically deterred by any sentence the Court imposes given the mandatory minimum 24-months required by 18 U.S.C. § 1028A. This defendant justly merits greater punishment, however, given the nature of the crime. This defendant intended to steal money by stealing identities. The scheme as to the Company was not a one-off event. It was not a mistake. It was not an error in judgment. It was a further instance of an established course of conduct. Isaiah Tenryk is smart and thoughtful, but he is also clearly reckless and therefore dangerous to others, at least financially. His crime merits greater punishment than 24 months.

In this case, to promote respect for the law, the Court's sentence should not treat the fraud as if it were nothing. Stealing a $3 million check and depositing it, all with the goal of getting the money, does not become nothing because the scheme did not succeed. To the contrary, as the Guidelines recognize, loss includes intended loss, precisely because it is the perpetrator's intent that goes to essence of the criminality. This defendant intended a very significant theft. That theft, standing alone, merits just punishment. And the intent to take money from a charity merits punishment separate and apart from the aggravated identity theft. Each crime has a separate and distinct victim and harm, both to the victim and to society.

This is also the kind of crime that requires general deterrence. As is evident, this defendant was connected to a network of persons who traffic in stolen U.S. Treasury checks. He was also connected to persons who fabricate false identity documents. All of those persons were connected

to the fraud, but without running the risk that this defendant ran by actually going into banks. The sentence in this case needs appropriately to deter fraudsters who believe that they can enjoy the rewards of crime with little risk, because they are behind the scenes.

*Unwarranted Disparities in Sentencing*

Putting the mandatory minimum to the side, because it addresses a free-standing crime with a distinct harm, a sentence of 34 months for the fraud in this case would not create an unwarranted disparity in sentencing.

According to Sentencing Commission data, from 2019 to 2023, there were 672 defendants at offense level 20 with USSG § 2B1.1 as the principal guideline. Of those, 94 percent got jail in whole or part. The average and median lengths of imprisonment were 25 and 27 months, respectively. *See* JSIN Data.[1]

For the 55 defendants who also had a mandatory minimum under 18 U.S.C. § 1028A, the average and median length of imprisonment in addition to the mandatory minimum was 24 months. *See* PSR ¶ 94.[2]

This is not an average or median case, given the intended victim and this defendant's involvement in longer course of conduct involving fraud through identity theft.

---

[1] https://jsin.ussc.gov/analytics/saw.dll?Dashboard&PortalPath=%2Fshared%2FJSIN%2F_portal%2FJSIN&page=Sentencing%20Table

[2] The PSR provides national data, not data tailored to the District of Massachusetts. The government respectfully submits that the Court should not consider unwarranted disparities based on the District of Massachusetts in isolation; otherwise, there is a risk of creating a disparity between a sentence for the same crime in New York where the defendant lived and here. Such state or regional differences in sentencing, standing alone, do not justify a higher or a lower sentence. *See, e.g., United States v. Davila-Gonzalez*, 595 F.3d 42, 49 (1st Cir. 2010) ("A district court's consideration of sentencing disparity 'aims primarily at the minimization of disparities among defendants nationally.'" (citation omitted)).

CONCLUSION

For foregoing reasons, the Court should impose the sentence requested by the government. The United States does not seek remand of the defendant upon sentencing and does not oppose a self-report date that, within reason, will allow the defendant to complete his ongoing therapy and developmental program.

Respectfully submitted,

JOSHUA S. LEVY
United States Attorney

By:    /s/Kriss Basil
KRISS BASIL
Assistant United States Attorney

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/Kriss Basil
KRISS BASIL
Assistant United States Attorney